UNITED STATES *v*. DR. OIDTMANN STUDIOS, INC. (GEO. WM. RUEFF, INC.)
(No. 4431)[1]

[1] C. A. D. 260.

United States Court of Customs and Patent Appeals, November 1, 1943

*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

*Lane & Wallace* (*William H. Fox* of counsel) for appellee.

[Oral argument October 5, 1943, by Mr. Donohue and Mr. Fox.]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court (Third Division) sustaining a protest of appellees against the classification and assessment with duty by the collector at the port of New Orleans of the structural parts of a main altar and two complete side altars, under the provisions of paragraph 232 (d) of the Tariff Act of 1930.

Appellees in their protest claimed that the articles mentioned were entitled to entry free of duty under the provisions of paragraph 1774 of the said act, and the trial court so held. It appears that Geo. Wm. Rueff, Inc., one of the appellees, is a nominal party only, it having acted as a broker in making the entry of the merchandise, and hereinafter the Dr. Oidtmann Studios, Inc., is referred to as the appellee.

The provisions of the tariff act involved read as follows:

PAR. 232 (d). Marble, breccia, and onyx, wholly or partly manufactured into monuments, benches, vases, and other articles, and articles of which these sub-

stances or any of them is the component material of chief value, not specially provided for, 50 per centum ad valorem.

PAR. 1774. Altars, pulpits, communion tables, baptismal fonts, shrines, or parts of any of the foregoing, and statuary (except casts of plaster of Paris, or of compositions of paper or papier-mâché), imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes.

The cause was submitted to the trial court upon the testimony of Reverend Charles B. Anderson, and a stipulation between the parties which insofar as is here pertinent reads as follows:

It is stipulated and agreed between counsel, in the matter of the above protest as follows:

That the items imported in this shipment (except 1 Marble Credence Table found in excess and appraised at $72 net) which were assessed with duty at 50% under Par. 232 (d), Tariff Act of 1930, consist of the following:

a. The items in Cases 54/56 consist of certain pieces, fragments, segments, or sections, which are structural parts of a main altar; and

b. The items in Cases 57/66 consist of two complete Side Altars.

That all of the items in said Cases 54/56 were physically attached to and became integral, constituent, and component parts of the main altar in the St. Louis Cathedral, in New Orleans, Louisiana.

That the two complete side altars in said Cases 57/66 also were installed in the said St. Louis Cathedral.

That the St. Louis Cathedral is a corporation organized and operated exclusively for religious purposes.

That all of the said items were the subject of two contracts between Dr. Oidtmann Studios, Inc., and the congregation of the St. Louis Cathedral, entered into on May 16, 1938, and May 22, 1938, photostatic copies of which have been filed with the entry papers in this case.

That thereafter a letter of presentation of the said structural parts of the main altar and the said two side altars to the St. Louis Cathedral, dated July 22, 1938, and signed by Rev. C. B. Anderson was filed with the entry papers.

That a letter of acceptance dated July 22, 1938, covering all of said items signed by Pastor Rev. Charles Serodes, O. M. I. on behalf of the St. Louis Cathedral was also filed with the entry papers.

That the purchase price of all of said items, and all costs and charges incident to their installation were paid to the Dr. Oidtmann Studios, Inc., by the Treasurer of the St. Louis Cathedral, with funds received from said Rev. C. B. Anderson for that express purpose.

That Rev. C. B. Anderson is neither employed by nor connected with the St. Louis Cathedral, but is connected with St. Vincent de Paul Church, in New Orleans, Louisiana.

That Customs Form 3331, duly executed by the importer herein, was filed with the collector prior to liquidation of the entry, and also is attached to the entry papers.

That said photostatic copies of said contracts, said letters of presentation and acceptance, and said Customs Form 3331, may be received in evidence herein.

That the copy of a letter to the Appraiser of Merchandise at New Orleans, Louisiana, dated July 8, 1939, signed by W. J. Harmon, Customs Agent in charge, which is attached to the entry papers, and Exhibits 1 and 2 for identification, may also be received in evidence herein.

It appears that the involved entries were entered on August 24

1938, and on July 22, 1938, two letters were filed with the Collector of Customs, reading as follows:

Church, St. Louis Cathedral. City, New Orleans. State, La.
Date, July 22, 1938.

Hon. Secretary of the Treasury, *Washington, D. C.*

Honorable Sir: I, the undersigned, have presented to Very Rev. C. Serodes, O. M. I., Pastor of St. Louis Cathedral, the following: 1 Main Altar in marble, 2 Side Altars in marble with platforms, true and permanent works of art.

Respectfully yours,

Rev. C. B. Anderson,
*St. Vincent de Paul, N. O., La.*

Church, St. Louis Cathedral. City, New Orleans. State, La.
Date, July 22, 1938.

Hon. Secretary of the Treasury, *Washington, D. C.*

Honorable Sir: I, the undersigned, Rector of St. Louis Cathedral, beg to state that I am willing to accept 2 Side Altars in marble with platforms, 1 Main Altar in marble, true and permanent works of art, as mentioned in the accompanying Letter of Presentation.

I, furthermore, beg to state that these side altars and Main Altar will not be paid for from the funds of the church, and I hereby certify that St. Louis Cathedral is a corporation known as a Roman Catholic Church, located at New Orleans, and was incorporated under the provisions of the Statute Laws of the State of Louisiana, governing the organization of Roman Catholic Churches.

Respectfully,

Charles Serodes, O. M. A.

It further appears that the contracts under which the articles here involved were installed in the Saint Louis Cathedral in New Orleans were made between appellee and "The Congregation of Saint Louis Roman Catholic Cathedral" and signed by Archbishop Joseph F. Rummel, its president, and by appellee.

One of the contracts provided for changes in the main altar and also for a variety of other articles and their installation, all according to specifications attached thereto. The specifications recited that the price of the main altar was $2,150.

The second contract covered the side altars completely installed in the church, the price therefor being $2,800.

In each of said contracts the aforesaid congregation agreed to pay to appellee the full contract prices named therein.

Reverend Charles B. Anderson, pastor of the St. Vincent de Paul Church in New Orleans, La., testified that at the request of the Archbishop of the St. Louis Cathedral he agreed to make a donation to the cathedral.

With respect to the transaction he testified as follows:

A. Your Honor, the Archbishop came to my home, telling me he was reopening the Cathedral, and he wanted it to look nice, and he said the side altars were old, and the main altar needed a lot of repair work done on it, and the marble work needed repairs, and asked me to make a donation in the name

of my Bishop, Bishop Laval, and that he would appreciate it if I would give the donation. I told the Archbishop I would, provided he would put up a tablet in honor of my Bishop, Bishop Laval. So he said he would, and I said I would go ahead and make the donation. I was called sometime later on, that things were ready, and the amount that I would be expected to donate would be $5,500.00, and I went to the American Bank & Trust Co., and borrowed the money, the $5,500.00, and had it in my account, put in a note for it in my account, and I brought it to the Pastor of the Cathedral. I do not know whether it was. Later on after that, the Pastor of the Cathedral called me and told me to please come with him to the Customhouse, and I signed a paper that I had donated these altars to the Cathedral, which I did. It was the first time that I learned the object was to waive the duty. It was news to me. I went and signed that paper, and I was of the opinion it was a settled matter. My check was cashed, and the matter was dropped. I say I do not know anything about the duty whatsoever. I never heard about it. I simply made a generous donation to the Archibishop's church.

Judge KEEFE. The imported articles were bought on your order?

The WITNESS. I do not know whether they were or not. I simply gave the donation, simply gave the check to the Pastor of the Cathedral. I never signed any papers to import it, in fact I knew nothing of the importation until I was called to the Customhouse.

Judge KEEFE. I presume what he signed, was the usual form as to donations.

Mr. WEIL. Yes.

By Mr. WEIL:

Q. Father, may I refresh your recollection? You don't know when the St. Louis Cathedral, the people connected with the St. Louis Cathedral, entered into a contract with the Dr. Oidtmann Studios, Incorporated?—A. No; I don't know that.

Q. Now at the time you obtained this loan from the American Bank & Trust Co., you signed a note; is that correct?—A. Yes.

Q. Did anybody else sign that note with you?—A. My Archbishop. I would never have been able to do so without his permission.

Q. Of what diocese?—A. The Archbishop of the diocese.

Q. What is his name?—Archbishop Rummel.

Judge KEEFE. That is the customary procedure for borrowing money for church purposes?

The WITNESS. Yes.

By Mr. WEIL:

Q. Did you import these altars or parts?—A. No, sir.

Q. And did you know anything about the importation of them until you went to the Customhouse, Father?—A. I think that was about the first time I heard anything about the question of duty.

Q. Now at the time you made the contribution there was some alteration and repair work being done on the St. Louis Cathedral?—A. Reopened and redecorated.

Q. That was prior to the Eucharistic Congress?—A. I think it was about that time. I do not know just the date.

Q. Did you present the money to the St. Louis Cathedral?—A. I gave the Pastor the check.

Q. And that was all you knew about it?—A. That is all.

Q. Did you know that that money was to be applied for the purchase of altars and parts, by importing merchandise?—A. Did I know it was going to be spent for these altars?

Q. I know you knew it was going to be spent for altars. Did you know it was going to be applied to the purchase of altars and parts that were to be imported?— A. I have no recollection of whether these were going to be imported. Probably the Archbishop told me that, but I was not connected with the importation in any possible way. I had nothing to do with the case except to give them the donation. It did not matter to me what they did with the money. I know they were going to buy the altars.

A report from the Bureau of Customs to the appraiser of merchandise at New Orleans, introduced in evidence, states:

Mr. Joseph L. Koenig, president of Dr. Oidtmann Studios, Inc., when in this office recently, said that he told the representatives of the Congregation of St. Louis Cathedral with whom he discussed the work to be done by his corporation, that he could make a better price if the altars were a presentation to the church, and that the prices agreed upon were on the basis of free entry of the altars on the ground that they were being presented to the church. He said, however, that he did not know at the time the contracts were entered into or when installation was effected, who was presenting these altars. He said also that his corporation ordered the altars in its own name, and was fully responsible for any loss or damage which might have occurred up to the time they were installed and accepted by the Cathedral. Payment to his corporation, he says, was made by the Cathedral.

It is evident that Mr. Koenig, as president of Dr. Oidtmann Studios, Inc., dealt exclusively with the Congregation of St. Louis Cathedral through its proper representatives.

Upon the stipulation and evidence in the record the Customs Court sustained the protest to the extent hereinbefore indicated and entered judgment accordingly.

The only question before us is whether a donation to a religious organization for the purpose of defraying the cost of altars purchased by said organization, the donor being in no way privy to the purchase of the altars or having any knowledge thereof prior to their importation, brings them, when imported, within the provisions of paragraph 1774, *supra*, and therefore not subject to duty.

We say that this is the only question before us because of the stipulation, which recites that "the purchase price of all of said items, and all costs and charges incident to their installation were paid to the Dr. Oidtmann Studios, Inc., by the Treasurer of the St. Louis Cathedral, with funds received from said Rev. C. B. Anderson for that express purpose."

The evidence in the record falls short of supporting all of the recitals above quoted, but as the Government is bound by its stipulation, we must consider the case accordingly.

We would first observe that there is nothing in the contracts in evidence with respect to any donations to defray the cost of any of the articles therein enumerated; nor is there any statement that any of the articles were to be imported. So far as the contracts are concerned, the only parties in any way interested were the St. Louis

Cathedral and appellee, and if the duties paid should be refunded appellee will receive the same and be the beneficiary thereof.

It is true that the letter from the Bureau of Customs to the Appraiser, hereinbefore quoted, recites that the president of appellee stated to a customs agent that the prices agreed upon of the involved articles were on the basis of free entry of the altars on the ground that they were being presented to the church. However, no provision was made in the contracts with respect thereto and the St. Louis Cathedral incurred no greater liability if the imported articles were imported and dutiable.

It is clear from the record that the articles imported were not presented to the St. Louis Cathedral by Father Anderson or by anyone.

Father Anderson made a donation to the St. Louis Cathedral of money, not altars, and with such money the St. Louis Cathedral purchased the altars. They were never presented to the St. Louis Cathedral without charge, but were paid for by the St. Louis Cathedral. Father Anderson never had either title to, possession of, or dominion over the imported articles and hence he could not have made a presentation of them to the St. Louis Cathedral without charge.

It has been suggested that the distinction between donating money to a religious organization for the purchase of altars and presenting or donating the articles themselves is very technical and should be ignored through a liberal construction of the statute. The difficulty with this suggestion is that the statute expressly requires that in order to come within its provisions, altars must be imported for presentation (without charge) to a religious organization, and we are not at liberty to enlarge by construction the plain and unambiguous provisions of the statute.

The trial court in its decision stated:

Had Congress, when drafting the provisions of paragraph 1774 of the Tariff Act of 1930, intended that the donor should have something to do with the importation or the foreign purchase of the articles, it could have readily so indicated in the paragraph. We fail to find any ambiguity in the language of the paragraph. The intention of Congress is clear that the imported articles indicated are entitled to free entry when they are brought to this country specially for presentation without charge to and for the use of a religious corporation. As held by the Supreme Court, provisions of this character should be liberally construed in favor of the importer and any doubt as to the true construction resolved in his favor.

We are in agreement with the statement in the above quotation that there is no ambiguity in the language of the paragraph, but we are unable to agree that the imported articles "were brought to this country specially for presentation (without charge) to and for the use of a religious corporation." The articles were furnished to the St. Louis Cathedral by appellee pursuant to contracts under which the St. Louis Cathedral agreed to pay and did pay to appellee the

price agreed upon. The mere fact that the St. Louis Cathedral paid for them out of a special fund did not change the transaction from a sale to the St. Louis Cathedral to a presentation to it of the imported articles without charge.

As for the statement of the trial court above quoted that "Had Congress, when drafting the provisions of paragraph 1774 of the Tariff Act of 1930, intended that the donor should have something to do with the importation or the foreign purchase of the articles, it could have readily so indicated in the paragraph" the answer is that Congress in clear and unambiguous language provided in paragraph 1774 that to come within its provisions the articles therein named must have been imported "in good faith for presentation (without charge)" to a religious organization. This language clearly requires that a donor must at the time of importation have such relationship to the imported articles, either directly or by his agent, that he could exercise control over the articles, for without such control they could not be presented by him without charge to a religious organization.

Congress could if it saw fit have provided that the articles named in paragraph 1774, when imported in good faith for the use of a religious organization, should be entitled to free entry, or it could have provided that if such articles were paid for by a religious organization out of a special fund donated for that purpose they should be entitled to free entry, but for some reason it did neither of these things but by clear and express language it provided that only when the described articles are imported in good faith for presentation without charge to a religious organization shall they be entitled to free entry. It seems to us too clear for argument that when articles are purchased by the religious organization and paid for by it as in the case at bar the paragraph has no application.

It is a matter of common knowledge that the principal revenue of nearly all of the religious organizations of the country is derived from donations, and we can think of no reason why Congress should admit articles free of duty if paid for by the religious organization out of a special donation, but should exact duties thereon if paid for out of general donations.

It appears that prior to the enactment of the Tariff Act of 1922 all imported altars were dutiable. Paragraph 1674 of that act was identical in so far as altars are concerned with paragraph 1774 of the Tariff Act of 1930.

We have found no cases in which the question here presented was decided and the parties hereto have cited none.

In the case of *Rev. John T. Hill* v. *United States*, 59 Treas. Dec. 1008, T. D. 44847, the U. S. Customs Court had before it the question of the dutiability of certain altars imported from Italy, and after-

wards installed in the Holy Cross Catholic Church at Louisville, Ky. They were assessed with duty under the provisions of paragraph 233 of the Tariff Act of 1922. The pastor of the church filed a protest, claiming that the altars were entitled to free entry either under paragraph 1674 or paragraph 1704 of said act. Paragraph 1674, as hereinbefore indicated, is the predecessor of paragraph 1774 of the Tariff Act of 1930.

The court held that the claims could not be sustained under either paragraph.

With respect to the claim under paragraph 1674, the court stated that the Altar Society connected with the church in August 1928 signed a declaration that the society was donating to the church the altars, but that it did not appear that the society had sufficient funds to pay for them and they were paid for out of the funds of the church, pursuant to a contract between the church and the contractor who imported the altars.

The court in its decision stated:

There may be a technical distinction between presenting an altar and presenting the money with which to purchase an altar, but there is no practical difference. If this were the situation here we should be inclined to hold in favor of the plaintiff. We do not believe that such a situation existed. The donors could not give what they never possessed. There is a vast difference between a promise to make a gift and a gift. It seems to us that the facts in this case are in all material particulars identical with those found by this court (then the Board of General Appraisers) in the *Reardon* case, reported in T. D. 38465, G. A. 8360. As already stated, that decision was affirmed by the United States Court of Customs Appeals, and we think it concludes the plaintiff herein.

It will be observed that the court in the above quotation merely stated its inclination but did not find it necessary to decide the question of whether there was a distinction between the donation of money and the donation of altars.

In the case of *Reardon* v. *United States*, 11 Ct. Cust. Appls. 233, T. D. 38992, referred to in the above quotation, and also here relied upon by appellee, the question now before us was not involved. It was there held that certain imported church altars were not works of art entitled to free entry under either paragraph 652 or paragraph 655 of the tariff act of 1913. Said paragraph 655 provided that works of art "imported expressly for presentation to * * * incorporated religious society" should be free of duty.

All that was actually decided in that case was that the altars there involved were not works of art. However, it its opinion the court, with reference to various questions passed upon by the Board of General Appraisers, now the United States Customs Court, said:

Furthermore under paragraph 654 the board held that the church in question was not an institution "established for the encouragement of * * * education," and that the altars had not been imported for "exhibition" therein, within the intent

of the paragraph; the board also found that the bond required by the paragraph had not been given by the importer. And under paragraph 655 the board found upon the testimony that the altars had not been "imported for presentation to * * * an incorporated religious society." It was not denied that the church was such a society within the sense of the statute, but it was held that the actual importation of the merchandise was effected by the 'E. Hackner Co. for the purpose of performing its contract. The board held also that the regulations established by the department under the latter paragraph had not been complied with by the importer. We do not disagree with the board in respect to any of these conclusions, but we have not discussed them in detail since we find the merchandise to be foreign to the primary classifications relied upon in the protest.

In conclusion we must hold for the reasons hereinbefore stated that the trial court erred in its decision that the involved altars were imported for presentation without charge to the St. Louis Cathedral, and the judgment appealed from is *reversed*.